**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF WEST VIRGINIA**
**ELKINS**

**ROBIN L. ROSENTHAL,**

               Plaintiff,

**v.**

          **CIVIL ACTION NO.: 2:15-CV-41**
          **(BAILEY)**

**CAROLYN W. COLVIN,**
**Acting Commissioner of Social**
**Security,**

               Defendant.

## REPORT AND RECOMMENDATION

### I.   INTRODUCTION

On June 5, 2015, Plaintiff Robin L. Rosenthal ("Plaintiff"), through counsel Bruce A. Kirkwood, Esq., filed a Complaint in this Court to obtain judicial review of the final decision of Defendant Carolyn W. Colvin, Acting Commissioner of Social Security ("Commissioner" or "Defendant"), pursuant to Section 205(g) of the Social Security Act, as amended, 42 U.S.C. § 405(g) (2015). (Compl., ECF No. 1). On August 11, 2015, the Commissioner, through counsel Helen Campbell Altmeyer, Assistant United States Attorney, filed an Answer and the Administrative Record of the proceedings. (Answer, ECF No. 9; Admin. R., ECF No. 10). On September 10, 2015, and October 8, 2015, Plaintiff and the Commissioner filed their respective Motions for Summary Judgment. (Pl.'s Mot. for Summ. J. ("Pl.'s Mot."), ECF No. 13; Def.'s Mot. for Summ. J. ("Def.'s Mot."), ECF No. 14). The matter is now before the undersigned United States Magistrate Judge for a Report and Recommendation to the District Judge pursuant to 28 U.S.C. § 636(b)(1)(B) and LR Civ P 9.02(a). For the reasons set forth below, the

undersigned finds that substantial evidence supports the Commissioner's decision and recommends that the Commissioner's decision be affirmed.

## II. PROCEDURAL HISTORY

On September 12, 2013, Plaintiff protectively filed a Title II claim for disability and disability insurance benefits ("DIB"). (R. 15, 139). Subsequently, on August 22, 2013, Plaintiff protectively filed a Title XVI claim for supplemental security income ("SSI") benefits. (R. 15). In both applications, Plaintiff alleges disability that began on August 1, 2013. (R. 202, 209). Because Plaintiff's earnings record shows that she acquired sufficient quarters of coverage to remain insured through March 31, 2016, Plaintiff must establish disability on or before this date. (R. 15). On January 14, 2014, Plaintiff's claim was initially denied. (R. 141). Subsequently, on June 11, 2014, Plaintiff's claim was denied again upon reconsideration. (R. 157). After these denials, Plaintiff filed a written request for a hearing. (R. 163).

On November 14, 2014, a video hearing was held before United States Administrative Law Judge ("ALJ") H. Munday in Charlottesville, Virginia. (R. 15, 39, 176). Tony Melanson, an impartial vocational expert, appeared and testified in Charlottesville. (R. 15, 39, 195). Plaintiff, represented by counsel Anthony W. Rogers, Esq., appeared and testified in Cumberland, Maryland. (R. 15, 39). On January 14, 2015, the ALJ issued an unfavorable decision to Plaintiff, finding that she was not disabled within the meaning of the Social Security Act. (R. 12). On April 6, 2015, the Appeals Council denied Plaintiff's request for review, rendering the ALJ's decision the final decision of the Commissioner. (R. 1).

## III.    BACKGROUND

### A.    Personal History

Plaintiff was born on April 29, 1957, and was fifty-six years old at the time she filed her claims for DIB and SSI benefits. (See R. 77). She is five feet tall and weighs approximately 160 pounds. (R. 64). She is single and lives alone in a mobile home. (Id.). She completed school through the twelfth grade and never received any specialized, trade or vocational training. (R. 69, 231). Her prior work experience includes working as an Information Technology customer service representative, call center representative, retail assistant manager/cashier and waitress. (R. 69, 71). She alleges that she is unable to work due to the follow impairments: (1) major depressive disorder; (2) chronic fatigue; (3) fibromyalgia; (4) narcolepsy; (5) central serous retinopathy; (6) memory loss; (7) anxiety; (8) panic attacks; (9) uncontrolled crying; (10) hot flashes and (11) a learning disability. (R. 230).

### B.    Medical History

#### 1.  Medical History Pre-Dating Alleged Onset Date of August 1, 2013

On April 7, 2009, Plaintiff presented to Anthony J. Bollino, Jr., M.D., her primary care physician, for a scheduled appointment. (R. 454). Previously, Plaintiff had "transferred into [Dr. Bollino's] practice from Doctor Stephen Crossland's [practice] with the established diagnoses of chronic fatigue, depression and fibromyalgia," all of which Dr. Crossland had diagnosed when Plaintiff was thirty-two years old. (R. 490). During Plaintiff's appointment, Dr. Bollino noted that Plaintiff was prescribed Lexapro, Cymbalta and Xanax for depression and that her "mood has been great." (R. 454). Dr. Bollino also noted that Plaintiff underwent carpal tunnel surgery in her right hand in February of that

year and had "been off from work since then." (Id.). Finally, Dr. Bollino noted that Plaintiff "[was] generally doing very well." (Id.).

On July 1, 2009, Plaintiff returned to Dr. Bollino's office, complaining that "her right hand [was] not significantly better after her carpal tunnel [surgery]." (R. 456). During this visit, Dr. Bollino examined Plaintiff's right hand and noted that "[s]he still has firm nodular areas and paresthesias of the radial nerve distribution." (Id.). Dr. Bollino diagnosed Plaintiff with Dupuytren's contracture and referred her to the "hand surgery center" for further evaluation. (Id.).

Plaintiff continued to present to Dr. Bollino's office for scheduled appointments over the next several months. (R. 457-58). On October 12, 2009, Plaintiff was "quite emotional" when complaining of poor function and pain in her right hand. (R. 457). Dr. Bollino examined Plaintiff and noted that the carpal tunnel surgery had been unsuccessful. (Id.). He further noted that Plaintiff was dissatisfied with her orthopedic/hand surgeon but that she "refuses to consider injections" in her right hand, which had been recommended to her. (Id.). Finally, he noted that Plaintiff was concerned that her job was in jeopardy. (Id.). Specifically, Dr. Bollino documented that Plaintiff's "employer is now keeping track of her lost time[, which] threatens her job despite medical excuses for all time off." (Id.). After examining Plaintiff, Dr. Bollino increased Plaintiff's Lexapro due to her depressive symptoms. (Id.).

On November 10, 2009, Dr. Bollino reported that Plaintiff's depression was "doing quite well" and that Plaintiff "is going back to work and is better able to withstand the stresses of her job." (R. 458). However, Dr. Bollino further reported that Plaintiff's right hand was "no better." (Id.). He noted that Plaintiff was concerned that her right

hand would limit her employability. (Id.). He also noted that Plaintiff had sought treatment for her right hand at Johns Hopkins Hospital in Baltimore, Maryland, where she was informed that her symptoms were not caused by Dupuytren's contracture but were instead "the result of wearing a hard brace too long." (Id.). Dr. Bollino disagreed, stating that "it is obviously [Dupuytren's] and she was not wearing braces enough to produce such an effect." (Id.).

On January 4, 2010, Plaintiff presented to a West Virginia University ("WVU") clinic in Morgantown, West Virginia, complaining of a burning sensation and pain in her right hand. (R. 329). After an examination, Plaintiff was noted to have "an obvious nodule . . . at the base of the right thumb significant for trigger finger, although there [is] no obvious triggering at this time." (Id.). Afterwards, Plaintiff was diagnosed with a "[r]ight motor branch problem into the first dorsal intraosseous compartment" and was scheduled for an electromyography ("EMG"). (R. 330, 332).

On March 1, 2010, Plaintiff returned to the WVU clinic for a follow-up appointment. (R. 338). During this appointment, Plaintiff's EMG results were reviewed, which revealed "[n]o . . . abnormality of bony architecture or alignment" and no evidence of carpal tunnel syndrome in her right hand. (R. 336, 340). However, the results were suggestive of early carpal tunnel syndrome changes in her left hand. (R. 340). After her results were reviewed, Plaintiff was injected with Celestone and lidocaine in her right hand for treatment of her "trigger thumb," which she tolerated well. (R. 338).

On March 11, 2010, Plaintiff presented to Dr. Bollino's office for a scheduled appointment. (R. 459). During this appointment, Plaintiff complained that her fibromyalgia was causing her muscles and joints to ache. (Id.). After noting that Plaintiff

used only ibuprofen for pain, Dr. Bollino started Plaintiff on Savella, a medication frequently prescribed to fibromyalgia patients. (Id.). Dr. Bollino also noted that Plaintiff "lost her job in January and has been feeling down." (Id.). Finally, Dr. Bollino noted that Plaintiff was scratching at her skin to relieve tension and that she had scars and open lesions on her forearms and on the back of her neck. (Id.). To treat her scratching issues, he suggested that Plaintiff undergo cognitive therapy to learn effective coping mechanisms and prescribed Zyprexa, an antipsychotic medication. (Id.).

Over the next several months, Plaintiff returned to Dr. Bollino's office for scheduled appointments. (R. 460-64). On February 8, 2011, Plaintiff stated that she was "experiencing daily myalgia/arthralgias" related to her fibromyalgia. (Id.). However, Dr. Bollino noted that Plaintiff had "been off all of her medication . . . since December [of] 2010 due to financial difficulties." (Id.). Nevertheless, Dr. Bollino noted that Plaintiff had not noticed any difference in her mood or energy levels and that, although she "still [felt] somewhat depressed," she was "[d]oing well." (Id.). Dr. Bollino further noted that Plaintiff had begun "caretaking a 94 year old woman a few days a week and [that she] really enjoyed the company and income." (Id.).

On March 22, 2011, Plaintiff complained to Dr. Bollino of "increasing symptoms of anhedonia, sadness, irritability, reclusiveness, and difficulty coping." (R. 461). Dr. Bollino prescribed Cymbalta for Plaintiff's worsening symptoms. (Id.). Dr. Bollino further noted that Plaintiff "now has access to medications [at] Wal-Mart." (Id.).

On July 11, 2011, Plaintiff continued to complain to Dr. Bollino of fibromyalgia and depressive symptoms. (R. 462). Regarding her fibromyalgia, Dr. Bollino noted that Plaintiff experienced "[o]ngoing diffuse pain resulting in [an] inability to adequately

function for employment." (Id.). Regarding her depression, Dr. Bollino noted that Plaintiff was undergoing menopause and that he was uncertain "how much changes in hormones have affected her emotional state." (Id.). Dr. Bollino further noted that medication had "thus far been inadequate" in treating Plaintiff's depression and that Plaintiff did not believe counseling would be adequate either. (Id.). When delving into the root of Plaintiff's depression, Dr. Bollino noted, *inter alia*, that Plaintiff had been abandoned by her mother at one year of age, raised by "strict and rather uncaring people hired by her father" and abused by her male caretaker. (Id.). Dr. Bollino also noted that Plaintiff's single attempt at marriage had failed. (Id.). After documenting that Plaintiff was non-suicidal, Dr. Bollino prescribed Wellbutrin for Plaintiff's depression. (Id.).

On August 10, 2011, Plaintiff returned to Dr. Bollino's office for a scheduled appointment. (R. 463). During this appointment, Plaintiff expressed that, while she did not believe "medication [would] make a real difference" in treating her depression, she was satisfied with her medication regimen. (Id.). Therefore, Dr. Bollino refilled Plaintiff's prescriptions, although he changed Plaintiff's prescription of Concerta to Ritalin. (Id.).

On January 4, 2012, Plaintiff complained of vision problems to Dr. Bollino. (R. 464). Initially, Dr. Bollino noted that Plaintiff had again "been without her medications for awhile [due to financial reasons] and ha[d] . . . noticed a loss of effect." (Id.). Dr. Bollino then interviewed Plaintiff regarding her vision problems. (Id.). Plaintiff informed Dr. Bollino that she had experienced reduced fields of vision bilaterally and a "light pulsing sensation" for "about a month or longer." (Id.). Plaintiff further informed Dr. Bollino that she had visited an optometrist, who referred her to a retinal specialist, and that her

symptoms had "finally resolved." (Id.). After the interview, Dr. Bollino added "[r]etinal [d]isease" to Plaintiff's list of diagnoses. (See id.). Dr. Bollino also issued prescriptions for citalopram, an antidepressant, and Methylin, a medication used to treat attention-deficit hyperactivity disorder, and noted that Plaintiff would "try to refill [her] Wellbutrin [prescription] later." (Id.).

On January 4, 2012, Plaintiff presented to Robert E. Parnes, M.D., a retinal specialist. (R. 324-25). During this visit, Dr. Parnes noted that Plaintiff had experienced "flashes" in both eyes that started on December 4, 2011, and lasted for twenty days. (R. 324). Dr. Parnes further noted that Plaintiff experienced stinging in her left eye at times, observed a "spot" in her left vision field and could not "see as far in the distance with" her left eye. (Id.). After an examination, Dr. Parnes diagnosed Plaintiff with macular puckering in her right eye and an occasional floater in her left eye. (See R. 325, 344). Dr. Parnes then ordered a fluorescein angiogram, which revealed "[e]piretinal membrane superonasal to the fovea, with folds, but no macular edema[;] . . . PED [in the left eye] . . . [and n]onspecific subtle macular RPE disruption, left eye greater than right eye – with no sign of active CNVM." (R. 326).

On April 4, 2012, Plaintiff presented to Dr. Bollino's office for a scheduled appointment. (R. 465). During this appointment, Dr. Bollino noted that Plaintiff "finds [her citalopram prescription] ineffective" and that Plaintiff had not yet refilled her Wellbutrin prescription due to financial reasons. (Id.). Therefore, Dr. Bollino discontinued Plaintiff's prescriptions of citalopram and Wellbutrin and prescribed fluoxetine for her depression. (Id.). Dr. Bollino noted that "[t]reatment is quite difficult in this situation because [Plaintiff's] finances impede any kind of adequate treatment plan." (Id.). However, when

Plaintiff returned to Dr. Bollino's office on July 3, 2012, Dr. Bollino noted that Plaintiff was functioning "well on [her] present medication" and that she "[l]ooks and acts normal [with] no signs of depression." (R. 466). Nevertheless, Dr. Bollino refilled Plaintiff's Wellbutrin prescription. (Id.).

On August 21, 2012, Plaintiff presented to the WVU Eye Institute after being referred by Dr. Bollino. (R. 344, 466). Frank Joseph Ruda, M.D., evaluated Plaintiff. (R. 353). Dr. Ruda noted that Plaintiff was scheduled for a follow-up appointment with Dr. Parnes in April of 2012 but did not appear due to financial reasons. (R. 344). Dr. Ruda further noted that Plaintiff complained of difficulty "seeing detail." (Id.). After an examination, Dr. Ruda diagnosed Plaintiff with PED of "[u]ncertain etiology" in the left eye, possible central serous retinopathy and macular puckering in the right eye. (R. 353). Dr. Ruda expressed an intention to monitor Plaintiff's eye conditions. (Id.).

On January 3, 2013, Plaintiff presented to Dr. Bollino's office for a scheduled appointment. (R. 467). During this appointment, Dr. Bollino evaluated Plaintiff's fibromyalgia and depression. (Id.). Regarding Plaintiff's fibromyalgia, Dr. Bollino reported that Plaintiff experienced diffuse discomfort in, *inter alia*, her legs, ribs and abdomen. (Id.). Nevertheless, Dr. Bollino declined to prescribe any medication to treat the discomfort because of Plaintiff's financial situation. (Id.). Regarding Plaintiff's depression, Dr. Bollino reported that Plaintiff found her medication regimen "less than satisfactory." (Id.). However, Dr. Bollino further reported that Plaintiff believes her depressive symptoms extend back to her childhood and that, therefore, her depression is likely dysthymic in nature. (Id.). Dr. Bollino noted that dysthymic depression "is difficult

to treat and probably no matter what [Plaintiff] will not get better than she is[,] . . . [which is] bolstered by the fact that she has no money or insurance." (Id.).

On July 18, 2013, Plaintiff returned to Dr. Bollino's office, complaining of "dyspnea with exertion and fatigability." (R. 468). During this visit, Dr. Bollino noted that Plaintiff had found a job and could afford more extensive treatment. (Id.). However, Dr. Bollino further noted that Plaintiff "becomes overly stressed and cannot function" at times during the workday. (Id.). Dr. Bollino documented that Plaintiff had previously been prescribed Xanax for these situations but that she was reluctant to use it. (Id.). After an examination, Dr. Bollino prescribed Ambien to help Plaintiff sleep and encouraged counseling, in which Plaintiff had expressed an interest. (Id.).

### 2. Medical History Post-Dating Alleged Onset Date of August 1, 2013

On August 2, 2013, Plaintiff presented to the emergency room at Western Maryland Regional Medical Center, complaining that she had experienced a "meltdown" at work[1] that day and could not "deal with life anymore." (R. 369). During a triage assessment, Plaintiff stated that she "had thoughts of suicide[/]shooting herself" and that she kept a small revolver in her home. (R. 371). Plaintiff also stated that she smoked marijuana approximately two to three times a month to reduce her anxiety. (R. 372). After her assessment, Plaintiff was diagnosed with recurrent major depressive disorder and suicidal ideation and was admitted to the inpatient behavioral health unit. (R. 370-71, 384).

In the behavioral health unit, Abishek R. Rizal, M.D., performed a psychiatric evaluation of Plaintiff. (R. 376-78). When interviewing Plaintiff regarding her psychiatric

---

[1] At this time, Plaintiff was employed as an Information Technology customer service representative. (R. 69, 372).

history, Dr. Rizal noted that Plaintiff has a history of major depressive disorder, which worsened when her only child moved out of her home in 1999. (R. 376). Dr. Rizal further noted that Plaintiff "ha[d] been feeling severely depressed over the past [five] to [six] years after menopause" and that she had possessed suicidal thoughts over the past six to eight months. (Id.). Finally, Dr. Rizal noted that Plaintiff's biological mother suffered from mental health problems and that Plaintiff had not previously sought psychiatric treatment before her "meltdown" at work. (Id.). After the interview, Dr. Rizal performed a psychiatric assessment of Plaintiff. (R. 377). During the assessment, Dr. Rizal documented that Plaintiff was alert and oriented and that her mood was depressed and despondent. (Id.). Dr. Rizal also documented that Plaintiff's concentration was fair, memory was intact, thought process was linear and goal-directed, and insight and judgment were poor. (Id.).

After being admitted to the behavioral health unit, Plaintiff "calmed down" and her "[s]uicidal urges disappeared." (R. 380). However, Plaintiff remained in the behavioral health unit for a total of four days. (See R. 369-84). Prior to her discharge from the unit, Plaintiff's Wellbutrin prescription was increased and the revolver was removed from her home. (R. 380-81). Additionally, Plaintiff was referred to Appalachian Behavioral Health and instructed to remain on sick leave from her job "until she is seen by them and they determine [that] she is ready to return to work." (Id.).

On August 27, 2013, Plaintiff presented to Dr. Bollino's office, complaining of depressive symptoms. (R. 469). During this visit, Dr. Bollino noted that Plaintiff had recently been hospitalized and changed her diagnosis of "[d]epression" to "[a]gitated [d]epression." (Id.). Dr. Bollino also noted that Plaintiff had started therapy at

Appalachian Behavioral Health but that "she then lost her job and insurance." (Id.). Dr. Bollino recommended that Plaintiff pursue therapy through Potomac Highlands, an "indigent program" managed by the West Virginia Department of Health and Human Resources. (Id.). After Plaintiff's visit, Dr. Bollino documented that Plaintiff "seem[ed] reasonably adjusted to the situation and . . . realize[d] . . . that the job she had been given was more than she could handle." (Id.).

On April 8, 2014, Plaintiff presented to William Scott Thomas, M.D., of New Creek Family Medicine, PLLC, for a psychiatric evaluation. (R. 471). During this evaluation, Dr. Thomas noted that Plaintiff was alert and oriented and that her mood was depressed. (Id.). Dr. Thomas further noted that Plaintiff had no suicidal, homicidal or paranoid thoughts and that her memory was intact. (Id.). Finally, Dr. Thomas noted that Plaintiff's insight and judgment were fair and that her thought process was tangential. (Id.). After the evaluation, Dr. Thomas diagnosed Plaintiff with narcolepsy, severe recurrent major depressive disorder and panic disorder without agoraphobia. (Id.). Dr. Thomas also determined that Plaintiff's Global Assessment of Functioning ("GAF") score was forty out of one hundred. (Id.). To treat Plaintiff's psychiatric conditions, Dr. Thomas refilled Plaintiff's prescriptions for Wellbutrin, Lexapro, Xanax and Ritalin and referred Plaintiff to Sara L. Evans, LPC, for therapy. (Id.).

On May 6, 2014, Plaintiff returned to New Creek Family Medicine to officially establish herself as a new patient.[2] (R. 480-81). During this visit, Plaintiff was evaluated by Marie Del Signore, FNP-C ("FNP-C Signore"). (Id.). Plaintiff informed FNP-C Signore

---

[2] At this time, Plaintiff started receiving primary care from New Creek Family Medicine instead of from Dr. Bollino. (R. 480). When asked why she was no longer receiving medical care from Dr. Bollino, Plaintiff stated that she "now has [a] WV medical card and [that Dr. Bollino would] not accept" her new card. (Id.).

that she had been diagnosed with fibromyalgia and that the pain caused by her fibromyalgia could be unbearable at times. (R. 480). After performing a physical examination of Plaintiff, FNP-C Signore documented that Plaintiff possessed multiple self-inflicted lesions to her back, abdomen and legs. (Id.). FNP-C Signore diagnosed Plaintiff with, *inter alia*, unspecified myalgia and myositis. (Id.). After informing Plaintiff that she could not receive long-term pain management from New Creek Family Medicine per its internal policies and procedures, FNP-C Signore prescribed tramadol for Plaintiff's pain. (R. 481).

On May 6, 2014, Plaintiff presented to Dr. Evans' office for therapy as recommended by Dr. Thomas. (R. 443). During this visit, Dr. Evans extensively interviewed Plaintiff regarding her personal history, including her childhood. (Id.). Dr. Evans also educated Plaintiff about relaxation techniques and assisted Plaintiff in practicing the techniques they discussed. (Id.).

On May 28, 2014, Plaintiff returned to New Creek Family Medicine for a scheduled appointment with Dr. Thomas. (R. 473). During this visit, Plaintiff informed Dr. Thomas that she "ha[d] been waking in the middle of the night screaming" and that, after waking, she would cry for approximately one hour before falling back asleep. (Id.). Plaintiff further informed Dr. Thomas that she did not know why these incidents had occurred and that she "ha[d] no recollection of any nightmare[s] or anything." (Id.). When asked about the frequency of the incidents, Plaintiff estimated that she had experienced three incidents "in the past month or so." (Id.). Finally, Plaintiff informed Dr. Thomas that she "ha[d] been picking at her skin . . . for about a year." (Id.). After examining Plaintiff, Dr. Thomas added post-traumatic stress disorder ("PTSD") to

Plaintiff's list of diagnoses. (Id.). He also increased Plaintiff's dosage of Xanax and prescribed Zyprexa for her "picking" and Minipress for her nightmares. (Id.).

Over the next several months, Plaintiff presented to Dr. Evans' office for scheduled therapy sessions. (R. 444-47, 488). During a session on June 6, 2014, Plaintiff informed Dr. Evans that she felt like she was "in a fog" most days. (R. 444). Dr. Evans noted that Plaintiff experienced difficulty walking and sitting for the length of the two-hour session, as well as difficulty focusing on the conversation. (Id.). After the session, Dr. Evans reported that Plaintiff "appeared to benefit from [their] time together" and "[seemed] more able to overcome [the] 'fog.'" (Id.). In subsequent sessions, Plaintiff's "depression . . . [and the] pain of [her] childhood" were addressed. (R. 488). However, Plaintiff did not attend all of her scheduled sessions. (Id.).

On June 24, 2014, Plaintiff presented to New Creek Family Medicine for a scheduled appointment with Dr. Thomas. (R. 475). During this appointment, Dr. Thomas reported that Plaintiff was "doing much better." (Id.). Specifically, Dr. Thomas noted that Plaintiff believed "[Z]yprexa is a miracle drug for her" and that it stopped her nightmares, allowing her to sleep through the night for the first time in thirty years. (Id.). After examining Plaintiff, Dr. Thomas instructed her to continue her prescribed medication regimen. (Id.).

On October 15, 2014, Plaintiff returned to New Creek Family Medicine for a follow-up appointment with Dr. Thomas. (R. 477). During this visit, Plaintiff reported that she had ceased taking Minipress because it caused her ankles to swell. (Id.). Plaintiff further reported that, while Zyprexa had "helped her picking," it had caused her to gain weight and was no longer preventing her nightmares. (Id.). Finally, Plaintiff reported that

she was experiencing low back and hip pain and needed "to bend over while standing for relief" from the pain. (Id.). After an examination, Dr. Thomas diagnosed Plaintiff with an "[u]nspecified back ache" and ordered X-rays of her hips and lumbosacral spine, which were scheduled for later that week. (R. 478). Dr. Thomas also discontinued Plaintiff's prescriptions for Minipress and Ritalin and increased her dosage of Zyprexa. (R. 477-78).

On October 21, 2014, Plaintiff returned to New Creek Family Medicine for a review of her X-ray results with FNP-C Signore. (R. 485). During this visit, Plaintiff reported that she was experiencing "increased pain" that day "due to the weather." (Id.). After an examination, FNP-C Signore informed Plaintiff that her X-ray results revealed no abnormalities. (Id.). Therefore, FNP-C Signore diagnosed Plaintiff with lumbago and sacroiliitis. (Id.). To treat Plaintiff's pain, FNP-C Signore prescribed cyclobenzaprine, a muscle relaxant, and a high dose of ibuprofen. (Id.). FNP-C Signore also referred Plaintiff to physical therapy. (Id.).

### 3. Medical Reports/Opinions

#### a. Mental Status Examination by Tracy L. Cosner-Shepherd, M.S., December 4, 2013

On December 4, 2013, Tracy L. Cosner-Shepherd, M.S., a state agency psychologist, performed a Mental Status Examination of Plaintiff. (R. 402-08). Prior to this examination, Dr. Cosner-Shepherd reviewed the records of Plaintiff's that were available to her, which included "[p]art of [Plaintiff's d]isability form." (R. 403). Dr. Cosner-Shepherd also noted that Plaintiff's chief complaints include depression, chronic fatigue, fibromyalgia, difficulty sleeping and anxiety and panic attacks. (R. 402). Finally, Dr. Cosner-Shepherd noted that Plaintiff's impairments started at least twenty-five years

ago and that they started interfering with Plaintiff's ability to work approximately two years ago. (Id.).

The Mental Status Examination consisted of a clinical interview and a mental assessment. (Id.). During the clinical interview, Plaintiff discussed with Dr. Cosner-Shepherd her medical history, mental treatment history and educational history. (R. 404-05). Specifically, Plaintiff informed Dr. Cosner-Shepherd that she suffers from, *inter alia*, anxiety, depression, panic attacks, difficulty sleeping, lack of energy, flashbacks and difficulty concentrating and retaining information. (R. 403). Plaintiff also informed Dr. Cosner-Shepherd that she "smoke[s] marijuana a couple times a week to help calm her nerves." (R. 404).

Plaintiff and Dr. Cosner-Shepherd also discussed Plaintiff's daily activities during the clinical interview. (R. 407). Plaintiff informed Dr. Cosner-Shepherd that her morning routine involves awakening at 11:00 A.M. or 12:00 P.M., feeding her pet cat and brewing coffee. (Id.). After completing this morning routine, Plaintiff stated that she "usually stays in her bed clothes," lays on the sofa and watches television. (Id.). Plaintiff further stated that, throughout the day, she may cook a small meal or tend to her plants, which she grows inside her house and in her garden. (Id.). When asked about the frequency in which she partakes in certain activities, Plaintiff estimated that she tidies her kitchen and bathroom every day, washes laundry twice a week, washes dishes three times a week and shops for groceries once or twice a month. (Id.).

After interviewing Plaintiff, Dr. Cosner-Shepherd performed a thorough mental assessment of Plaintiff. While Plaintiff's mood was "slightly anxious" during the assessment, Dr. Cosner-Shepherd noted that Plaintiff was pleasant, cooperative and

engaging. (R. 405). Dr. Cosner-Shepherd further noted that Plaintiff's thought process, judgment, remote memory, social functioning and concentration, persistence and pace were normal. (R. 405-07). However, Dr. Cosner-Shepherd documented that Plaintiff's insight was "fair to average" and that her immediate and recent memory were mildly to moderately deficient. (R. 405). Dr. Cosner-Shepherd also documented that Plaintiff "reported some obsessive-compulsive tendencies . . . [in] that she likes things to be neat, organized and in their place" and that, while Plaintiff "has had suicidal ideations [in the past, she has] . . . no [such] immediate plan or intent." (Id.).

After completing the Mental Status Examination, Dr. Cosner-Shepherd concluded that Plaintiff suffers from" depressive symptoms; anxious symptoms with possible PTSD; poor coping skills with marijuana abuse; a history of family dysfunction with past abuse and impaired memory skills. (R. 406). When listing Plaintiff's specific diagnoses, Dr. Cosner-Shepherd included, *inter alia*, major depressive disorder, anxiety disorder and pain disorder. (Id.). She opined that Plaintiff's prognosis is "[f]air." (R. 407).

**b. Disability Determination Examination by Stephen Nutter, M.D., December 18, 2013**

On December 18, 2013, Stephen Nutter, M.D., a state agency medical consultant, performed a Disability Determination Examination ("DDE") of Plaintiff. (R. 411-15). Prior to this examination, Dr. Nutter reviewed Plaintiff's medical records. (R. 411). Dr. Nutter then performed the DDE, which consisted of a clinical interview and a physical examination of Plaintiff. (See R. 411-15).

During the clinical interview, Plaintiff informed Dr. Nutter that she suffers from neck, back and joint pain and "numbness and tingling" in her hands and feet. (Id.). Plaintiff further informed Dr. Nutter that she has "problems with shortness of breath" and

that she is only able to walk twenty-five yards before requiring rest. (R. 412). Finally,

Plaintiff informed Dr. Nutter that she "uses marijuana." (Id.).

After the clinical interview, Dr. Nutter performed a physical examination of

Plaintiff. (R. 412-15). The examination revealed many normal findings, including no

"evidence of hypertensive or diabetic retinopathy." (See R. 412-15). However, the

examination also revealed several abnormal findings. (See id.). When summarizing

those findings, Dr. Nutter stated:

> [Regarding her back and neck, Plaintiff] had pain and tenderness of the cervical and lumbar spine, as well as tenderness in the thoracic spine. She had minimally reduced range of motion of the back and neck. . . . She could not squat because of back pain.
>
> [Regarding her joint pain, Plaintiff] had pain and tenderness in the shoulders, knees, hips and hands . . . . She had some mildly reduced range of motion of the joints. She had some diffuse tenderness in the thighs and the left upper arm as well.

(R. 415). Ultimately, Dr. Nutter concluded that Plaintiff suffers from chronic

cervical and dorsolumbar strain and diffuse arthralgia and myalgia. (R. 415).

### c. Disability Determination Explanation by Robert Mogul, M.D., January 13, 2014

On January 13, 2014, Robert Mogul, M.D., a state agency medical consultant,

prepared the Disability Determination Explanation at the Initial Level (the "Initial

Explanation"). (R. 77-91). Prior to drafting the Initial Explanation, Dr. Mogul reviewed

Plaintiff's medical records, treatment notes, Adult Function Report, Personal Pain

Questionnaire and Work History Report. (R. 78-80). After reviewing these documents,

Dr. Mogul concluded that Plaintiff suffers from the following severe impairments:

fibromyalgia, affective disorders, anxiety disorders and "[o]ther [r]etinal [d]isorders,"

including diabetic retinopathy. (R. 84). Dr. Mogul further concluded that Plaintiff's

statements regarding her symptoms and limitations are only "[p]artially [c]redible." (R. 85).

In the Initial Explanation, Dr. Mogul completed a physical residual functional capacity ("RFC") assessment of Plaintiff. (R. 86-87, 90). During this assessment, Dr. Mogul found that, while Plaintiff possesses no manipulative, visual, communicative or environmental limitations, Plaintiff possesses exertional and postural limitations. (R. 86-87). Regarding Plaintiff's exertional limitations, Dr. Mogul found that Plaintiff is able to: (1) occasionally lift and/or carry fifty pounds; (2) frequently lift and/or carry twenty-five pounds; (3) stand and/or walk for approximately six hours in an eight-hour workday; (4) sit for approximately six hours in an eight-hour workday and (5) push and/or pull with no limitations. (R. 86). Regarding Plaintiff's postural limitations, Dr. Mogul found that Plaintiff is able to frequently climb ramps/stairs, balance, stoop, kneel and crouch but only occasionally climb ladders/ropes/scaffolds and crawl. (See R. 86-87, 118). After completing the RFC assessment, Dr. Mogul determined that is able to perform medium, routine work. (R. 90).

Also in the Initial Explanation, Paula J. Bickham, Ph.D., a state agency psychologist, completed a Mental RFC Assessment of Plaintiff and a Psychiatric Review Technique form. (R. 84, 87-89). When completing the Mental RFC Assessment, Dr. Bickham found that Plaintiff possesses no social interaction limitations or adaptation limitations. (R. 88). However, Dr. Bickham further found that Plaintiff possesses sustained concentration and persistence limitations. (Id.). Specifically, Dr. Bickham found that Plaintiff is not significantly limited in her ability to: (1) carry out very short and simple instructions; (2) carry out detailed instructions; (3) maintain attention and

concentration for extended periods; (4) perform activities within a schedule, maintain regular attendance and be punctual within customary tolerances; (5) sustain an ordinary routine without special supervision; (6) work in coordination with or in proximity to others without being distracted by them and (7) make simple work-related decisions. (Id.). Additionally, Dr. Bickham found that Plaintiff is moderately limited in her ability to: (1) complete a normal workday and workweek without interruptions from psychologically based symptoms and (2) to perform at a consistent pace without an unreasonable number and length of rest periods. (Id.).

When completing the Psychiatric Review Technique form, Dr. Bickham initially noted that Plaintiff has been diagnosed with affective disorders and anxiety-related disorders. (R. 84). Dr. Bickham then analyzed the degree of Plaintiff's functional limitations. (Id.). Specifically, Dr. Bickham rated Plaintiff's limitations in maintaining social functioning and in her activities of daily living as "mild." (Id.). Dr. Bickham further rated Plaintiff's difficulties in maintaining concentration, persistence or pace as "moderate." (Id.). Finally, Dr. Bickham rated Plaintiff's episodes of decompensation as "none."[3] (Id.).

### d. Disability Determination Explanation by A. Rafael Gomez, M.D., May 30, 2014

On May 30, 2014, A. Rafael Gomez, a state agency medical consultant, prepared the Disability Determination Explanation at the Reconsideration level (the "Reconsideration Explanation"). (R. 109-23). Prior to drafting the Reconsideration Explanation, Dr. Gomez reviewed the same documents that Dr. Mogul had reviewed

---

[3] These findings depict the four "paragraph B" criteria that the Code of Federal Regulations sets forth for evaluating the severity of claimants' mental impairments. See 20 C.F.R. § 416.920a.

when drafting the Initial Explanation, in addition to Plaintiff's updated medical records and most recent Adult Function Report. (R. 110-14). After reviewing these documents, Dr. Gomez agreed with all of Dr. Mogul's conclusions contained in the Initial Explanation. (See R. 109-23).

Also in the Reconsideration Explanation, James Binder, M.D., a state agency psychologist, reviewed Dr. Bickham's Mental RFC Assessment and Psychiatric Review Technique form from the Initial Explanation. (See R. 120-21). While Dr. Binder largely agreed with Dr. Bickham's findings, Dr. Binder dissented from one finding contained in Dr. Bickham's Psychiatric Review Technique form. (See R. 116). Specifically, Dr. Binder rated Plaintiff's episodes of decompensation as "one or two" instead of "none." (Id.).

### e. Mental Impairment Questionnaire by William Scott Thomas, M.D., June 25, 2014

On June 25, 2014, Dr. Thomas of New Creek Family Medicine, one of Plaintiff's treating physicians, submitted a Mental Impairment Questionnaire on behalf of Plaintiff. (R. 309-13). In this questionnaire, Dr. Thomas reported that Plaintiff presented to his office for the first time on April 8, 2014, and that she returns to his office approximately once a month for scheduled appointments. (R. 309). Dr. Thomas further reported that Plaintiff's mental impairments include major depressive disorder, PTSD, panic disorder and a history of narcolepsy. (R. 309). Finally, Dr. Thomas reported that Plaintiff is not "currently abusing alcohol or using illegal drugs" and that she is able to "manage benefits in . . . her own best interest." (R. 313).

Dr. Thomas depicted Plaintiff's mental impairments and treatment in the Mental Impairment Questionnaire. Specifically, Dr. Thomas disclosed that Plaintiff's mental impairments started twenty-four years ago. (R. 310). He listed her symptoms as, *inter*

*alia*, poor memory, social withdrawal or isolation, difficulty thinking or concentrating, sleep disturbance and suicidal ideations, decreased energy and suicidal ideations or attempts. (R. 309). He estimated that Plaintiff's symptoms/impairments would cause her to be absent from work "more than three times a month." (R. 311).To treat Plaintiff's impairments, Dr. Thomas indicated that he prescribed Zyprexa, which resulted in "some improvement" in Plaintiff's conditions. (R. 310). Dr. Thomas further indicated, however, that Zyprexa may cause drowsiness or fatigue. He opined that, with treatment, Plaintiff's prognosis is "fair." (Id.).

Dr. Thomas also rated Plaintiff's mental abilities and the degree of her functional limitation in the Mental Impairment Questionnaire. (R. 311-12). Regarding her mental abilities, Dr. Thomas rated Plaintiff's ability to perform unskilled work as "fair" or "poor," depending on the specific task at hand. (Id.). Dr. Thomas then rated Plaintiff's abilities to perform semiskilled and skilled work as "poor." (R. 312). Finally, Dr. Thomas rated Plaintiff's abilities to interact appropriately with the general public, maintain socially appropriate behavior, travel in an unfamiliar place and use public transportation as "fair" and Plaintiff's ability to adhere to basic standards of cleanliness as "good." (Id.). Regarding Plaintiff's degree of functional limitation, Dr. Thomas rated Plaintiff as "marked" in her restriction of activities of daily living, difficulties in maintaining social functioning and deficiencies of concentration, persistence or pace. (Id.). Dr. Thomas further rated Plaintiff's episodes of decompensation as "four or more." (R. 312-13).

### f. Mental Impairment Questionnaire by Sara L. Evans, L.P.C., June 30, 2014

On June 30, 2014, Dr. Evans, Plaintiff's therapist, submitted a second Mental Impairment Questionnaire on behalf of Plaintiff. (R. 314-18). In this questionnaire, Dr.

Evans reported that Plaintiff presented to her office for the first time on April 25, 2014, and that, while Plaintiff was scheduled for nine sessions afterwards, she appeared to only four of those sessions. (R. 314). Dr. Evans further reported that Plaintiff's impairments include major depressive disorder, physical abuse of adult by a partner, fibromyalgia, economic problems and being a "victim of child neglect/abuse." (Id.). Finally, Dr. Evans reported that Plaintiff is not "currently abusing alcohol or using illegal drugs." (R. 318).

Dr. Evans detailed Plaintiff's impairments and treatment in the Mental Impairment Questionnaire. Specifically, Dr. Evans disclosed that Plaintiff's impairments started approximately three years ago. (R. 315). She listed Plaintiff's symptoms as, *inter alia*, poor memory, social withdrawal or isolation, anhedonia or pervasive loss of interests, paranoia or inappropriate suspiciousness, intrusive recollections of a traumatic experience and somatization unexplained by an organic disturbance, in which she referenced Plaintiff's fibromyalgia. (R. 314). She estimated that Plaintiff's impairments would cause her to be absent from work "more than three times a month." (R. 316). When discussing her treatment of Plaintiff's impairments, Dr. Evans indicated that Plaintiff had not progressed past "initial treatment" and that she recommended Plaintiff undergo further psychological evaluation. (R. 315, 318). She opined that Plaintiff's treatment "may take years." (R. 315).

Dr. Evans also rated Plaintiff's mental abilities and the degree of her functional limitation in the Mental Impairment Questionnaire. (R. 316-17). Regarding Plaintiff's mental abilities, Dr. Evans rated Plaintiff's ability to perform unskilled work as "fair" or "poor," depending on the specific task at hand. (Id.). Dr. Evans then rated Plaintiff's

abilities to perform semiskilled and skilled work as "poor." (R. 317). Finally, Dr. Evans

rated Plaintiff's ability to travel in an unfamiliar place as "poor" and her abilities to

interact appropriately with the general public, maintain socially appropriate behavior,

adhere to basic standards of cleanliness and use public transportation as "good." (Id.).

Regarding Plaintiff's degree of functional limitation, Dr. Evans rated Plaintiff as "marked"

in her restriction of activities of daily living, difficulties in maintaining social functioning

and deficiencies of concentration, persistence or pace. (Id.). Dr. Evans further rated

Plaintiff's episodes of decompensation as "three." (R. 317-18).

**C.    Testimonial Evidence**

During the administrative hearing on November 14, 2014, Plaintiff divulged her

relevant personal facts and work history. (See R. 39, 45-50, 60-65). Plaintiff lives alone

in a mobile home. (R. 64). She has one child who is fully grown and lives in

Chesapeake, Virginia. (R. 50). She occasionally smokes marijuana, estimating that she

does so "[m]aybe two times every couple months." (R. 65). Most recently, she was

employed as a help desk technician by the International Business Machines

Corporation ("IBM"). (R. 45). However, she lacked the training to understand the

technical aspects of the position. (R. 47). Because she "wasn't able to do the job[,]"

Plaintiff experienced suicidal thoughts and admitted herself to the hospital. (R. 45). After

her hospitalization, IBM terminated Plaintiff's employment because she had no "return

to work date." (R. 60).

Plaintiff testified that she suffers from physical impairments, including vision

anomalies and fibromyalgia. (R. 50-60). Regarding Plaintiff's vision anomalies, Plaintiff

has difficulty reading road signs and is not able to drive at night. (R. 50-51). Regarding

her fibromyalgia, Plaintiff was diagnosed with the condition when she was in her "very early 30's." (R. 57). When describing the symptoms of her fibromyalgia, Plaintiff explains that she "feel[s] that [she] should be able to see a bruise" when an object makes contact with her body. (Id.). To illustrate, Plaintiff provides the following example: "someone will walk up to you and they haven't seen you for [awhile] and they'll just tap you on the back of the shoulders and it's just pain that just vibrates through you." (R. 59). Her neck, spine, ribs and hips cause her the most pain. (R. 58-59). Because of her fibromyalgia, Plaintiff experiences difficulty performing certain activities, including dressing herself, vacuuming and washing her hair. (R. 59-60). To treat the condition, Plaintiff "recently started [taking] Flexeril," which has "help[ed] somewhat." (R. 59).

In addition to physical impairments, Plaintiff testified that she suffers from mental impairments, which constitute "the [crux] of [her] case" for DIB and SSI benefits. (R. 43). Without explicitly identifying her mental impairments, Plaintiff states that she has received treatment for the impairments over the past twenty-five years. (R. 49). Despite this treatment, however, Plaintiff believes her mental impairments have "gotten progressively worse." (Id.). Plaintiff considers "being let go" from her position at Frank's Coffee Service, Inc., which occurred three to four years ago, as the "straw[] that br[oke] the camel's back." (R. 63). Prior to this point in time, Plaintiff had been able "to put on a happy face" and work productively. (Id.). Now, Plaintiff is no longer able to leave her house at times due to her mental impairments. (R. 61). To treat the impairments, Plaintiff is prescribed Xanax, Lexapro, Wellbutrin and Zyprexa. (R. 59). Additionally, Plaintiff attends therapy sessions with Dr. Evans, which she finds "somewhat helpful," although she has failed to attend multiple scheduled sessions. (R. 61, 66).

Plaintiff testified regarding the symptoms that her mental impairments produce. First, her mental impairments cause her to suffer from a lack of motivation, which results in Plaintiff sleeping frequently. (Id.). While her medications cause drowsiness, she believes she "sleep[s] so [she does not] have to think." (Id.). Plaintiff's lack of motivation "has been going on for years" but has recently become "so bad that [she does not] leave the house." (Id.). Second, Plaintiff's mental impairments cause her to pick at her skin in her sleep, resulting in scars and open lesions on her body. (See R. 52-53). Plaintiff is prescribed Zyprexa for her picking, which has abated but failed to completely cease. (R. 53). Third, Plaintiff's mental impairments cause her to experience nightmares. (R. 53-54). Plaintiff has nightmares "a couple of times a week," during which awakens screaming and crying. (Id.). While she was prescribed Minipress for her nightmares, Plaintiff stopped taking the medication after it caused her feet to swell. (R. 53). Fourth, Plaintiff's mental impairments cause her to experience occasional suicidal thoughts. (R. 62). While these thoughts have been present "for the last couple years," Plaintiff does not act on these thoughts once she thinks of her son. (Id.). Finally, Plaintiff's mental impairments cause her to have difficulty concentrating and comprehending new information and to experience anxiety attacks multiple times a day. (R. 54, 62).

Finally, Plaintiff testified regarding her daily activities. On a typical day, Plaintiff awakens around 11:30 AM or 12:00 PM. (R. 52). After awakening, she feeds her pet cat and brews coffee. (Id.). She then moves to the couch to watch television. (Id.). For meals, Plaintiff prepares "something very easy." (Id.). Every few days, Plaintiff uses her computer to browse social media, chat with friends online or read the news. (R. 54-55).

She drives to a store every three days to purchase cigarettes and every month to purchase groceries. (R. 64). She also drives to "a lot of doctor appointments and . . . counseling appointments." (Id.). She visits her son approximately four times a year. (R. 50). When she leaves the house, Plaintiff tries to "take somebody with her" and will occasionally "need . . . extra medicine . . . to calm down to get through [the experience]." (R. 49-50, 56). After being awake for approximately four hours, Plaintiff sleeps a minimum of two hours before rising again. (R. 52). Thus, throughout the day, Plaintiff moves "from the bed to the couch and then back to the bed." (R. 49). Her "best sleep" occurs between the hours of 5:00 A.M. and 12:00 P.M. (R. 52).

**D.    Vocational Evidence**

**1.  Vocational Testimony**

Tony Melanson, an impartial vocational expert, also testified during the administrative hearing. (R. 67-74). Initially, Mr. Melanson testified regarding the characteristics of Plaintiff's past relevant work. (R. 67-71). Regarding Plaintiff's most recent employment position as an Information Technology customer service representative, Mr. Melanson characterized the work as sedentary, SVP: 7. (R. 69). As for Plaintiff's prior work as a call center representative, retail assistant manager/cashier and waitress, Mr. Melanson characterized the work as sedentary, SVP: 6, light to medium, SVP: 2 to 7 and light, SVP: 3, respectively. (R. 69, 71).

The ALJ then presented several hypothetical questions for Mr. Melanson's consideration.  In the first hypothetical question, the ALJ asked Mr. Melanson to:

> [A]ssume a hypothetical individual of [Plaintiff's] age, education and the past jobs you just described. Further assume that the individual is able to perform medium work with frequent balancing, stooping, kneeling, crouching and climbing of ramps and stairs, occasionally crawl and climb

ladders, ropes and scaffolds, occasional exposure to hazardous conditions including unprotected heights and moving machinery. Able to perform simple, routine tasks involving no more than simple, short instructions and simple work related decisions with few workplace changes. Occasional interaction with the general public, occasional interaction with supervisors and occasional interaction with coworkers.

Based on this hypothetical are any past jobs available?

(R. 71-72). Mr. Melanson testified that no "past jobs [would be] available" but that such an individual could work as a housekeeper, laundry worker and hand packer. (R. 72). In the second hypothetical question, the ALJ asked:

If I change that [first] hypothetical such that the interaction with the public is none and the interaction with coworkers is none and that's defined as others can be in the same general vicinity but no teamwork or interdependence is required.

Based on that change and that hypothetical, would the jobs that you identified be available?

(Id.). Mr. Melanson testified that such an individual could only work as a hand packer, not as a housekeeper or laundry worker. (Id.). Mr. Melanson further testified, however, that such an individual could also work as a machine feeder and stock clerk. (R. 73). The ALJ then repeated his second question but changed the hypothetical individual's qualifications from "able to perform medium [exertional] work" to able to perform light exertional work. (Id.). Mr. Melanson responded that such an individual could not perform Plaintiff's past work. (Id.).

Plaintiff's counsel, Mr. Rogers, also presented questions for Mr. Melanson's consideration during the administrative hearing. (R. 73-74). First, Mr. Rogers asked how much time an individual in the job positions Mr. Melanson had referenced "could be off task" in a normal workday. (Id.). Mr. Melanson opined that the individual could be off task up to "[fifteen] percent of their workday." (R. 74). Mr. Melanson further opined,

however, that if the individual was off task for "[fifteen] percent of their workday on a regular ongoing basis, [then they] would not be able to perform those [jobs]." (Id.). Second, Mr. Rogers asked how frequently an individual in the job positions Mr. Melanson had referenced could be absent from work. (Id.). Mr. Melanson responded that if the individual was absent for "[a]pproximately two days per month on a regular ongoing basis," then they would not be employable. (Id.).

### 2. Work History Reports & Disability Reports

In an undated Work History Report submitted by Plaintiff, Plaintiff indicated that she has worked approximately six job positions in the past twenty-five years. (R. 246-47). Specifically, Plaintiff has worked as a server/waitress and restaurant manager for various restaurants, customer service/sales agent for a credit card company, contact center agent for a call center, customer service representative for a spring water/coffee warehouse, assistant manager/cashier for a convenience store and, most recently, help desk agent for IBM. (Id.). When describing the duties of her most recent position, Plaintiff stated that she answered phone calls and then assisted the callers with their "technical computer issues," although she stated that she "was unable to learn the computer programs or the technical issues [with the] computers." (R. 247). She explained that the position required her to sit, reach and handle large and small objects for seven hours a day and to walk and stand for one hour a day. (Id.). She further explained that she was never required to climb, kneel, crouch, crawl, lift objects of any weight or supervise others. (Id.).

On October 22, 2013, Plaintiff completed a Disability Report. (R. 226-37). In this report, Plaintiff indicated that the following impairments limit her ability to work: (1) major

depressive disorder; (2) chronic fatigue; (3) fibromyalgia (4) narcolepsy; (5) central serous retinopathy; (6) memory loss; (7) anxiety; (8) panic attacks; (9) uncontrolled crying; (10) hot flashes and (11) a learning disability. (R. 230). Plaintiff further indicated that she stopped working on August 2, 2013, "[b]ecause of [her] condition(s)." (Id.). After stating that she has received treatment for both physical and mental conditions from health care professionals, she listed Ambien, ibuprofen, tramadol, Lexapro, Wellbutrin, Xanax and Ritalin as her prescribed medications. (R. 233).

Plaintiff's counsel Mr. Rogers submitted two Disability Report-Appeal forms on behalf of Plaintiff. (R. 259-66, 285-89). On February 20, 2014, Mr. Rogers reported that Plaintiff's mental condition had been "getting worse . . . [since] 2013." (R. 261). When explaining how Plaintiff's mental condition had worsened, Mr. Rogers implied that her anxiety attacks had become more severe, preventing her from leaving her house. (Id.). Mr. Rogers also reported that Plaintiff suffers from depression that "affects all motivation in [her] life." (R. 264). To illustrate, Mr. Rogers expressed that Plaintiff has no desire to leave the house, perform housework, shower or change out of her pajamas. (Id.). Finally, Mr. Rogers reported that Plaintiff suffers from nightmares and night sweats. (Id.).

On July 8, 2014, Mr. Rogers reported that Plaintiff's condition had changed. (R. 285-89). Specifically, Mr. Rogers reported that Plaintiff was "let[ting] things go," which caused her to feel guilty, creating a "never end[ing] cycle." (R. 288). Mr. Rogers also reported that Plaintiff's treatment plan had changed. (See R. 285-86). Mr. Rogers explained that Plaintiff was started on Zyprexa for anxiety and for her tendency "to pick

at [her]self physically" and on Minipress for her nightmares. (R. 285). Mr. Rogers further explained that Plaintiff had started therapy sessions with Dr. Evans. (R. 286).

## E.    Lifestyle Evidence[4]

### 1.  Personal Pain Questionnaire, Undated

In an undated Personal Pain Questionnaire submitted by Plaintiff, Plaintiff states that she suffers from pain in her back, shoulders and hands. (R. 254-56). Regarding her back pain, which extends from her neck to her hips, Plaintiff characterizes the pain as aching, stabbing, burning, stinging and continuous in nature. (R. 254). Plaintiff explains that her back pain is caused by fibromyalgia. (Id.). She describes the pain as "feel[ing] like [her spine is] locked," with the inability "to move freely [without] pain." (Id.). Plaintiff also describes factors that aggravate her pain, which include heat, cold weather, stress and physical activity. (Id.). To treat the pain, Plaintiff states that she takes tramadol and ibuprofen, which are "[s]ometimes" effective. (R. 255). However, Plaintiff further states that ibuprofen "makes [her] sick to [her] stomach." (Id.).

Regarding her shoulder pain, Plaintiff characterizes the pain as aching, stabbing, burning, stinging and continuous in nature. (Id.). Plaintiff explains that her shoulder pain, like her back pain, is caused by fibromyalgia. (R. 256). She further explains that the pain prevents her from "rais[ing her] arms above [her] shoulders, pull[ing,] push[ing], lift[ing] or carry[ing] anything." (Id.). When discussing aggravating factors, she lists stress, vacuuming, washing dishes, raising her arms and shampooing her hair. (Id.). To treat the pain, she states that she takes ibuprofen, which is sometimes effective. (Id.).

_____

[4] In addition to the following records, Plaintiff submitted letters from friends and a former employer in support of her claim for DIB and SSI benefits. (R. 275-76, 279-82). Plaintiff uses these letters primarily to reinforce her statements regarding her mental impairments, symptoms and limitations. (See id.).

Finally, regarding the pain in her hands, Plaintiff characterizes the pain as aching, burning, stinging, cramping and continuous in nature. (R. 256-57). Plaintiff explains that her right hand pain is more severe than her left. (R. 257). Plaintiff further explains that, in addition to pain, her hands feel swollen, numb and weak, which causes her to "always [be] dropping things." (R. 256). Plaintiff states that her symptoms are caused by carpal tunnel syndrome. (R. 257). When discussing aggravating factors, she lists mopping, scrubbing when cleaning, typing on a keyboard, using a computer mouse, writing and handling objects. (Id.). She declares that she does not take any medication to treat her hand symptoms. (Id.).

**2. First Adult Function Report, November 7, 2013**

On November 7, 2013, Plaintiff completed her first Adult Function Report. (R. 238-45). In this report, Plaintiff states that she is unable to work because "a life of severe depression has left [her] unable to live normally any longer." (R. 238). Plaintiff further states that, in addition to her depression, the following impairments prevent her from working: fibromyalgia, sleep disturbances, anxiety and panic attacks, fatigue and left eye central serous retinopathy. (R. 245).

Plaintiff discloses that she is limited in some ways but not others. In several activities, Plaintiff requires no or minimal assistance. (See R. 239-41). For example, Plaintiff is able to perform her own personal care and live independently, although her son "gives [her] money to pay [her] monthly bills." (Id.). Plaintiff is also able to operate a motor vehicle and leave the house without accompaniment, although she prefers to have a friend accompany her when she does so. (R. 241).

While Plaintiff is able to perform some activities, she describes how others prove more difficult due to her physical and mental impairments. Regarding her physical impairments, Plaintiff's conditions affect her ability to, *inter alia*, lift objects that are heavier than ten pounds, squat, bend, walk, sit and kneel. (R. 243). Due to these limitations, Plaintiff is unable to perform certain activities, including mowing grass, shoveling snow or partaking in "major housecleaning." (R. 230). Regarding her mental impairments, Plaintiff's conditions affect her ability to concentrate, recall information, learn new information, follow instructions and complete tasks. (R. 243). Plaintiff also has difficulty getting along with others, going out in public, socializing with men, handling stress, handling changes to her routine and learning new information due to her mental impairments. (R. 242-44). Most significantly, however, Plaintiff's mental impairments affect her motivation, leaving Plaintiff with "no desire to do anything anymore." (R. 242). For instance, Plaintiff no longer engages in hobbies and has little interest in her grooming habits. (See R. 239-40, 242).

Finally, Plaintiff details her daily activities. Plaintiff brews coffee, watches television and reads the newspaper each day after awakening. (R. 239). She then feeds and grooms her pet cat and spends time on her porch. (R. 239, 241). At some point during the day, Plaintiff prepares and consumes one meal. (R. 240). She also takes medication every day, which include Xanax, Lexapro, Ritalin and ibuprofen.[5] (R. 245). As for her sleeping habits, Plaintiff sleeps "on and off" throughout the day. (R. 239). Plaintiff also showers "sometimes," washes dishes "every couple of days," washes laundry and performs simple housecleaning tasks a "couple times a week" and shops for groceries and household items once a month. (R. 239-41).

---

[5] Plaintiff also wears prescription eyeglasses. (R. 244).

### 3. Second Adult Function Report, March 17, 2014

On March 17, 2014, Plaintiff completed her second Adult Function Report. (R. 267-74). In this report, Plaintiff explains that she has become more limited in her physical and mental abilities since her last Adult Function Report. (See R. 267). Regarding her physical abilities, Plaintiff is no longer able to sit or stand for extended periods of time or lift objects heavier than five to ten pounds. (Id.). She is not able to use a vacuum cleaner or "do anything that involves [lifting her] arms above [her] head," which interferes with her ability to wash and care for her hair. (R. 267-68). Her eyesight is worsening and, occasionally, "everything [will] look[] pink" for two to three minutes before returning to normal. (R. 274). She also has difficulty using her hands, is unable to balance when squatting or bending and is unable to lift herself up from a kneeling position. (R. 272, 274).

Regarding her mental abilities, Plaintiff no longer leaves the house by herself or engages in any social activities beyond talking to her son on the telephone. (R. 270-72). She is unable to follow spoken instructions and is only able to follow written instructions if they are short and simple. (R. 272). She cannot "handle any stress at all" and experiences "panic [and] anxiety attacks about everything." (R. 273). At night, she suffers from nightmares that she is never able to recall and "fear[s] being attacked in [her] home by a criminal." (Id.). She has difficulty with her short-term memory and, to learn new information, requires "things [to be] repeated [and] explained in a simple way." (Id.).

Finally, Plaintiff describes her new daily routine. Plaintiff still brews coffee and feeds her pet cat after awakening, prepares and consumes one meal per day and shops

for groceries once a month. (R. 268-70). However, Plaintiff now "hardly ever" leaves her house and only washes laundry and performs simple cleaning activities "a few times a month." (Id.). Her daily medications have also changed and now comprise Wellbutrin, tramadol, Klonopin and ibuprofen. (R. 274).

## IV.    THE FIVE-STEP EVALUATION PROCESS

To be disabled under the Social Security Act, a claimant must meet the following criteria:

> [The] individual . . . [must have a] physical or mental impairment or impairments . . . of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work. . . . '[W]ork which exists in the national economy' means work which exists in significant numbers either in the region where such individual lives or in several regions of the country.

42 U.S.C. § 423(d)(2)(A) (2004). The Social Security Administration uses the following five-step sequential evaluation process to determine whether a claimant is disabled:

> (i) At the first step, we consider your work activity, if any. If you are doing substantial gainful activity, we will find that you are not disabled.

> (ii) At the second step, we consider the medical severity of your impairment(s). If you do not have a severe medically determinable physical or mental impairment that meets the duration requirement . . . or a combination of impairments that is severe and meets the duration requirement, we will find that you are not disabled.

> (iii) At the third step, we also consider the medical severity of your impairments(s). If you have an impairment(s) that meets or equals one of our listings . . . and meets the duration requirement, we will find that you are disabled.

> [Before the fourth step, [your RFC] . . . is evaluated "based on all the relevant medical and other evidence in your case record . . . ."]

(iv) At the fourth step, we consider our assessment of your [RFC] and your past relevant work. If you can still do your past relevant work, we will find that you are not disabled.

(v) At the fifth and last step, we consider our assessment of your [RFC] and your age, education, and work experience to see if you can make an adjustment to other work. If you can make an adjustment to other work, we will find that you are not disabled. If you cannot make an adjustment to other work, we will find that you are disabled.

20 C.F.R. § 404.1520 (2015); 20 C.F.R. § 416.920 (2012). In steps one through four, the burden is on the claimant to prove that he or she is disabled and that, as a result of the disability, he or she is unable to engage in any gainful employment. Richardson v. Califano, 574 F.2d 802, 804 (4th Cir. 1978). Once the claimant so proves, the burden of proof shifts to the Commissioner at step five to demonstrate that jobs exist in the national economy that the claimant is capable of performing. Hicks v. Gardner, 393 F.2d 299, 301 (4th Cir. 1968). If the claimant is determined to be disabled or not disabled during any of the five steps, the process will not proceed to the next step. 20 C.F.R. § 404.1520; 20 C.F.R. § 416.920.

## V.    ADMINISTRATIVE LAW JUDGE'S DECISION

Utilizing the Social Security Administration's five-step sequential evaluation process, the ALJ found that:

1.     The claimant meets the insured status requirements of the Social Security Act through March 31, 2016.

2.     The claimant has not engaged in substantial gainful activity since August 1, 2013, the alleged onset date (20 CFR 404.1571 *et seq.*, and 416.971 *et seq.*).

3.     The claimant has the following severe impairments: chronic cervical and dorsolumbar strain; major depressive disorder; anxiety disorder; [PTSD]; pain disorder; myalgias; obesity (20 CFR 404.1520(c) and 416.920(c)).

4.    The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).

5.    After careful consideration of the entire record, the undersigned finds that the claimant has the [RFC] to perform medium work as defined in 20 CFR 404.1567(c) and 416.967(c) except she can frequently balance, stoop, kneel, crouch, and climb ramps and stairs. She can occasionally crawl and climb ladders, ropes, and scaffolds. She can have occasional exposure to hazardous conditions including unprotected heights and moving machinery. She can perform simple, routine tasks involving no more than simple, short instructions and simple work related decisions with few workplace changes. She can have occasional interaction with the general public, supervisors, and coworkers.

6.    The claimant is unable to perform any past relevant work (20 CFR 404.1565 and 416.965).

7.    The claimant was born on April 29, 1957 and was 56 years old, which is defined as an individual of advanced age, on the alleged disability onset date (20 CFR 404.1563 and 416.963).

8.    The claimant has at least a high school education and is able to communicate in English (20 CFR 404.1564 and 416.964).

9.    Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

10.    Considering the claimant's age, education, work experience, and [RFC], there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1569, 404.1569(a), 416.969, and 416.969(a)).

11.    The claimant has not been under a disability, as defined in the Social Security Act, from August 1, 2013, through the date of this decision (20 CFR 404.1520(g) and 416.920(g)).

(R. 17-32).

## VI. DISCUSSION

### A. Contentions of the Parties

In her Motion for Summary Judgment, Plaintiff contends that the Commissioner's decision is not supported by substantial evidence. (See Pl.'s Mem. in Supp. of her Mot. for Summ. J. ("Pl.'s Br.") at 1, ECF No. 13-1). Specifically, Plaintiff contends that the ALJ erred: (1) in determining that Plaintiff's central serous retinopathy is non-severe in nature and (2) in assigning "little weight" to the opinion of Plaintiff's treating physician, Dr. Thomas. (Id. at 5, 7). Plaintiff requests that the Court "reverse and/or remand this case to the Commissioner." (Id. at 9).

Alternatively, Defendant contends in her Motion for Summary Judgment that the Commissioner's decision "is supported by substantial evidence." (Def.'s Mot. at 1). To counter Plaintiff's arguments, Defendant contends that the ALJ: (1) reasonably determined that Plaintiff's eye impairment is non-severe in nature and (2) reasonably accredited little weight to Dr. Thomas' opinion. (Def.'s Br. in Supp. of her Mot. for Summ. J. ("Def.'s Br.") at 9, 10, 12, ECF No. 15). Defendant requests that the Court affirm the Commissioner's decision. (See id. at 16).

### B. Scope of Review

In reviewing an administrative finding of no disability, the scope of review is limited to determining whether the ALJ applied the proper legal standards and whether the ALJ's factual findings are supported by substantial evidence. Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990). A "factual finding by the ALJ is not binding if it was reached by means of an improper standard or misapplication of the law." Coffman v. Bowen, 829 F.2d 514, 517 (4th Cir. 1987). Likewise, a factual finding by the ALJ is not

binding if it is not supported by substantial evidence. <u>Richardson v. Perales</u>, 402 U.S. 389, 401 (1971). Substantial evidence is "such relevant evidence as a reasonable mind might accept to support a conclusion." <u>Id.</u> (quoting <u>Consol. Edison Co. v. NLRB</u>, 305 U.S. 197, 229 (1938)). Elaborating on this definition, the Fourth Circuit has stated that substantial evidence "consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a jury verdict were the case before a jury, then there is 'substantial evidence.'" <u>Shively v. Heckler</u>, 739 F.2d 987, 989 (4th Cir. 1984) (quoting <u>Laws v. Celebrezze</u>, 368 F.2d 640, 642 (4th Cir. 1966)). When determining whether substantial evidence exists, a court must "not undertake to reweigh conflicting evidence, make credibility determinations, or substitute [its] judgment for that of the [ALJ's]." <u>Johnson v. Barnhart</u>, 434 F.3d 650, 653 (4th Cir. 2005).

**C.    Analysis of the Administrative Law Judge's Decision**

**1.  Whether the ALJ's Determination that Plaintiff's Central Serous Retinopathy is Non-Severe in Nature is Supported by Substantial Evidence**

**a.    Whether the ALJ Erred in Determining that Plaintiff's Central Serous Retinopathy is Non-Severe in Nature**

Plaintiff argues that the ALJ erred at step two of the sequential evaluation process when she determined that Plaintiff's central serous retinopathy is non-severe in nature. (Pl.'s Br. at 6). Specifically, Plaintiff argues that "[c]learly, the finding . . . is not supported by substantial evidence." (<u>Id.</u> at 7). Defendant argues that the ALJ reasonably determined that Plaintiff's central serous retinopathy is non-severe in nature and that the finding is supported by substantial evidence. (Def.'s Br. at 10).

At step two of the sequential evaluation process, a claimant bears the burden of

proving that he or she suffers from a medically determinable impairment that is severe in nature. <u>Farnsworth v. Astrue</u>, 604 F. Supp. 2d 828, 851 (N.D. W. Va. 2009). When proving that he or she suffers from a medically determinable impairment, the claimant must show more than a "mere diagnosis of condition . . . . [I]nstead, there must be a showing of related functional loss." <u>Pierce v. Colvin</u>, No. 5:14CV37, 2015 WL 136651, at *16 (N.D. W. Va. 2015) (citations omitted). After such a showing, an impairment will be considered severe when, either by itself or in combination with other impairments, it "significantly limits [a claimant's] physical or mental abilit[ies] to [perform] basic work activities." <u>Pass v. Chater</u>, 65 F.3d 1200, 1203 (4th Cir. 1995) (quoting 20 C.F.R. § 416.920). Conversely, an impairment will be considered "'not severe' . . . if it [constitutes] a slight abnormality which has such a minimal effect on the individual that it would not be expected to interfere with [basic work activities]." <u>Evans v. Heckler</u>, 734 F.2d 1012, 1014 (4th Cir. 1984) (emphasis removed). Basic work activities are "the abilities and aptitudes necessary to do most jobs" and include the ability to see, hear and speak and to perform such physical functions as walking and standing. 20 C.F.R. § 404.1521 (1985).

In the present case, the undersigned finds that the ALJ did not err in determining that Plaintiff's central serous retinopathy is non-severe in nature for two reasons. First, Plaintiff failed to meet her burden of proving that she suffers from central serous retinopathy. In the ALJ's decision, the ALJ noted that "[t]here is no evidence that [Plaintiff] suffers from retinopathy." (R. 19). To refute this statement, Plaintiff states that "Dr. Parnes found that diagnostic imaging in January 2012 showed 'PED, serous in nature.'" (Pl.'s Br. at 6). However, a finding of a PED during an eye examination does

not equate to a diagnosis of retinopathy[6] and, despite the finding of a PED, Dr. Parnes never explicitly diagnosed Plaintiff with retinopathy. Furthermore, Plaintiff fails to identify any record indicating that she has been diagnosed with central serous retinopathy.[7] Therefore, Plaintiff fails to meet her burden of proving that she suffers from central serous retinopathy.

Second, assuming *arguendo*, that Plaintiff suffers from central serous retinopathy, Plaintiff fails to show that the retinopathy results in such functional loss as to preclude her from performing basic work activities. (R. 19). In the ALJ's decision, the ALJ noted that, even if evidence existed of retinopathy, "[t]here is no evidence that . . . [the retinopathy] causes any limitation in [Plaintiff's] ability to perform basic work activity." (R. 19). Plaintiff argues that the ALJ failed to consider her functional limitations established by the record. (Pl.'s Br. at 6). Specifically, Plaintiff points to: (1) her first Adult Function Report, in which "[Plaintiff] state[s] that her . . . impairments affect her ability to see" and (2) a treatment note drafted by Dr. Parnes in January of 2012, which reports that "[Plaintiff states she] can't see as far in the distance with [her left eye]." (Id.; R. 324). The ALJ, however, acknowledged that Plaintiff "reported problems with . . .

---

[6] In this context, "PED" refers to "pigmentary epithelial detachment." 1 Attorneys Medical Deskbook § 5:3 (2015). PEDs "are classified by clinical appearance and angiographic characteristics [such] as confluent drusen, serous, turbid," etc. Luis Arias, *Treatment of retinal pigment epithelial detachment with antiangiogenic therapy*, NATIONAL CENTER FOR BIOTECHNOLOGY INFORMATION (Apr. 26, 2010), http://www.ncbi.nlm.nih.gov/pmc/articles/PMC2861946/ (last visited January 20, 2016). Because PEDs "occur[]in association with *many* diseases of the retina," a finding of a PED does not automatically identify an eye condition. Id. (emphasis added).

[7] After stating that no evidence exists of retinopathy, the ALJ noted that, on December 18, 2013, Dr. Nutter found "[no] evidence of hypertensive or diabetic retinopathy." (R. 19). Plaintiff argues that the ALJ erred in relying on Dr. Nutter's findings over "the evidence of Dr. Parnes, a treat ophthalmologist" and that the ALJ "completely disregarded the evidence of Dr. Parnes." (Pl.'s Br. at 6). However, as noted above, Dr. Parnes never diagnosed Plaintiff with retinopathy. Moreover, an ALJ is "not obligated to comment on every piece of evidence presented." Pumphrey v. Comm'r of Soc. Sec., No. 3:14-CV-71, 2015 WL 3868354, at *3 (N.D. W. Va. June 23, 2015).

seeing" and referenced Plaintiff's first Adult Function Report.[8] (R. 23). Nevertheless, the ALJ found that Plaintiff's statements regarding her functional loss were "not entirely credible" because they were not "consistent with the objective medical evidence and other evidence." (R. 21). For example, the ALJ noted that, despite Plaintiff's reported vision problems, Plaintiff is able to watch television, read the newspaper, prepare easy meals, wash laundry, perform simple household cleaning activities and operate a motor vehicle independently. (R. 23-24). Plaintiff does not contest the ALJ's credibility finding. Plaintiff thus fails to meet her burden of proving that her retinopathy precludes her from performing basic work activities. Consequently, the undersigned finds that the ALJ's determination that Plaintiff's central serous retinopathy is non-severe in nature is supported by substantial evidence.

**b.    Harmless Error**

Assuming *arguendo* that the ALJ committed an error in determining that Plaintiff's central serous retinopathy is non-severe in nature, the undersigned finds that such error is harmless. An ALJ's failure to find that a specific impairment is severe at step two of the sequential evaluation process constitutes harmless error "if the ALJ 'continued through the remaining steps [of the evaluation process] and considered all of the

---

[8] While the ALJ stated that "[t]here is no evidence that [Plaintiff's alleged retinopathy] . . . causes any limitation in her ability to perform basic work activity" at step two of the sequential evaluation process, the ALJ did not provide her reasoning for this statement until step four. (R. 19, 21-31). However, a court must read an ALJ's decision "as a whole" when determining whether the ALJ considered all of a claimant's complaints and limitations. See, e.g., Smith v. Astrue, 457 F. App'x. 326, 328 (4th Cir. 2011) (rejecting a "per se rule that failure to provide sufficient explanation at step three requires remand and holding that [the] ALJ's finding at other steps of [the] sequential evaluation [process] may provide [a] basis for upholding [a] step three finding"); Kins v. Comm'r of Soc. Sec., No. 3:14-CV-86, 2015 WL 1246286, at *23-24 (N.D. W. Va. Mar. 17, 2015) (deeming an ALJ to have considered the plaintiff's non-severe impairments at step four when the ALJ previously discussed the impairments and their associated limitations at step two of the decision).

claimant's impairments.'" <u>Pierce</u>, 2015 WL 136651, at *19. In the present case, the ALJ

determined that Plaintiff suffered from multiple severe impairments, including chronic

cervical and dorsolumbar strain, major depressive disorder, anxiety disorder, PTSD,

pain disorder, myalgias and obesity. (R. 17). The ALJ, therefore, continued through the

remaining steps of the evaluation process, keeping in mind Plaintiff's vision complaints.

(<u>See, e.g.</u>, R. 23) (stating that Plaintiff "reported problems with . . . seeing"). Moreover,

Plaintiff does not contend that the ALJ failed to consider Plaintiff's vision impairments in

addition to her severe impairments throughout the remaining steps. (<u>See</u> Pl.'s Br. at 5-

8). Consequently, any error committed by the ALJ in determining that Plaintiff's central

serous retinopathy is non-severe in nature is harmless and does not require reversal of

the ALJ's decision.

### 2. Whether the ALJ Erred in Assigning "Little Weight" to the Opinion of Plaintiff's Treating Physician, William Scott Thomas, M.D.

Plaintiff argues that the ALJ failed to give proper weight to the opinion of Dr.

Thomas, one of Plaintiff's treating physicians. (Pl.'s Br. at 7). Specifically, Plaintiff

argues that the ALJ used an improper criterion to evaluate Dr. Thomas' opinion when

she "us[ed] the fact that Dr. Thomas said the [Plaintiff] did not abuse drugs to lessen his

credibility." (<u>Id.</u> at 8). Defendant counters by arguing that "[t]he ALJ provided legally and

factually sufficient reasons for her determination that the opinion [i]s entitled to little

weight." (Def.'s Br. at 12).

An ALJ must "weigh and evaluate every medical opinion in the record." <u>Monroe</u>

<u>v. Comm'r of Soc. Sec.</u>, No. 1:14CV48, 2015 WL 4477712, at *7 (N.D. W. Va. July 22,

2015). When evaluating each medical opinion, the ALJ must consider "the following

non-exclusive list: (1) whether the physician has examined the applicant, (2) the

treatment relationship between the physician and the applicant, (3) the supportability of the physician's opinion, (4) the consistency of the opinion with the record, and (5) whether the physician is a specialist." <u>Johnson v. Barnhart</u>, 434 F.3d 650, 654 (4th Cir. 2005); <u>see also</u> 20 C.F.R. § 404.1527 (2005). ALJs often accord "greater weight to the testimony of a treating physician" because the treating physician has necessarily examined the applicant and has a treatment relationship with the claimant. <u>Johnson</u>, 434 F.3d at 654. However, this "treating physician rule . . . does not require that the [treating physician's] testimony be given controlling weight." <u>Anderson v. Comm'r, Soc. Sec.</u>, 127 F. App'x. 96, 97 (4th Cir. 2005). Therefore, "if a physician's opinion is not supported by clinical evidence or if it is inconsistent with other substantial evidence, it should be accorded significantly less weight." <u>Id.</u>

In the present case, the undersigned finds that the ALJ did not fail to give proper weight to Dr. Thomas' opinion. At step four of the sequential evaluation process, the ALJ assigned "little weight" to the opinion of Dr. Thomas as set forth in the Mental Impairment Questionnaire dated June 25, 2014. (R. 30). Specifically, the ALJ assigned little weight to Dr. Thomas' opinion because the opinion: (1) was not supported by the longitudinal record; (2) was internally inconsistent and (3) reported that Plaintiff "was not . . . abusing illegal drugs . . . [when Plaintiff] testified that she smokes marijuana . . . and [when Dr. Thomas' own] treatment notes indicate that she smoke[s] marijuana occasionally." (<u>Id.</u>). Plaintiff contests only the third line of reasoning, arguing that it constitutes an improper criterion for evaluating a medical opinion. (Pl.'s Br. at 7-8).

However, the ALJ's line of reasoning is proper for several reasons. First, the ALJ's line of reasoning falls under two of the factors listed in 20 C.F.R. § 404.1527,

which are explicitly approved factors for ALJs to consider when evaluating medical opinions. Specifically, the ALJ's line of reasoning analyzed the supportability of the opinion and the consistency of the opinion with the record. Second, even if the ALJ's line of reasoning cannot be interpreted as one of the explicitly approved factors, the ALJ is permitted by the Code of Federal Regulations to consider "any [other] factors . . . [that] tend to support or contradict the opinion." 20 C.F.R. § 404.1527(c)(6). Because the ALJ's line of reasoning tends to contradict Dr. Thomas' opinion, the ALJ was authorized to consider it. Finally, Plaintiff points to no authority for her contention that the ALJ's line of reasoning constitutes an improper criterion.[9]

Plaintiff further argues that, pursuant to SSR 96-5p, 1996 WL 374183, at *2, 6 (July 2, 1996), the ALJ should have recontacted Dr. Thomas if she found that Dr. Thomas' "opinion [wa]s inconsistent with the medical evidence of record and . . . [wa]s unable to ascertain the basis for th[e] opinion." (Pl.'s Br. at 8). However, "the [Code of Federal R]egulations only requires the [ALJ] to recontact a treating physician when the evidence . . . receive[d] from [the] treating physician . . . is *inadequate for [the ALJ] to determine whether [the claimant] is disabled*." Clay v. Astrue, No. 2:08CV25, 2009 WL 62261, at *22 (N.D. W. Va. Jan. 9, 2009) (emphasis added). Contrary to Plaintiff's argument, the ALJ found Dr. Thomas' opinion inconsistent with the other evidence of record and not "inadequate." See id. (stating that an ALJ may reject the opinion of a treating physician when it is "inconsistent with the other evidence of record" without

---

[9] Plaintiff refers to Breeden v. Weinberger, 493 F.2d 1002 (4th Cir. 1974), to support her contention that credibility determinations "based upon improper criteria cannot be sustained." (Pl.'s Br. at 8). However, in Breeden, the ALJ "refused to accept any of the testimony of [the claimant's] friends and kinfolk, not because [the testimony] was unbelievable but because of the source." Breeden, 493 F.2d at 1010. Therefore, while the Breeden Court held that the ALJ had considered an "improper or irrational criteria," the Breeden case is factually distinguishable from the instant case. Id.

recontacting the treating physician). Because the medical records in this case provide an adequate basis for the ALJ's determination that Plaintiff is not disabled, the ALJ was not required to recontact Dr. Thomas. Thus, the ALJ committed no error and Plaintiff's argument is without merit. In conclusion, the ALJ utilized a proper line of reasoning in evaluating the weight to be given to Dr. Thomas' opinion. Further, it was unnecessary for the ALJ to contact Dr. Thomas to determine whether Plaintiff was disabled. Therefore, the ALJ did not err in assigning little weight to the opinion of Dr. Thomas.

## VII.   <u>RECOMMENDATION</u>

For the reasons herein stated, I find that the Commissioner's decision denying Plaintiff's application for DIB and SSI benefits is supported by substantial evidence. Accordingly, I **RECOMMEND** that Plaintiff's Motion for Summary Judgment (ECF No. 13) be **DENIED**, Defendant's Motion for Summary Judgment (ECF No. 14) be **GRANTED**, the decision of the Commissioner be affirmed and this case be **DISMISSED WITH PREJUDICE**.

Any party may, within fourteen (14) days after being served with a copy of this Report and Recommendation, file with the Clerk of the Court written objections identifying the portions of the Report and Recommendation to which objections are made and the basis for such objections. A copy of such objections should also be submitted to the Honorable John Preston Bailey, United States District Judge. Failure to timely file objections to the Report and Recommendation set forth above will result in waiver of the right to appeal from a judgment of this Court based upon such Report and Recommendation. 28 U.S.C. § 636(b)(1); <u>United States v. Schronce</u>, 727 F.2d 91, 94

(4th Cir. 1984), <u>cert. denied</u>, 467 U.S. 1208 (1984); <u>Wright v. Collins</u>, 766 F.2d 841, 845-48 (4th Cir. 1985); <u>Thomas v. Arn</u>, 474 U.S. 140, 155 (1985).

The Court directs the Clerk of the Court to provide a copy of this Report and Recommendation to all counsel of record, as provided in the Administrative Procedures for Electronic Case Filing in the United States District Court for the Northern District of West Virginia.

Respectfully submitted this 19th day of February, 2016.

ROBERT W. TRUMBLE
UNITED STATES MAGISTRATE JUDGE